652 So.2d 1182 (1995)
Edward R. BECKER, M.D., Edward R. Becker, M.D., P.A., and Palm Beach Urology Associates, P.A., Appellants/Cross-Appellees,
v.
Richard L. WILLIAMS and Sue Williams, his wife, Appellees/Cross-Appellants.
No. 93-0806.
District Court of Appeal of Florida, Fourth District.
March 15, 1995.
Motion for Rehearing and/or Certification Denied May 4, 1995.
*1183 Ralph O. Anderson of Hicks, Anderson & Blum, P.A., Miami, and Metzger Sonneborn & Rutter, West Palm Beach, for appellants/cross-appellees.
Jane Kreusler-Walsh of Jane Kreusler-Walsh, P.A., and Lake Lytal, Jr. of Lytal & Reiter, P.A., West Palm Beach, for appellees/cross-appellants.
BARR, ROBBIE M., Associate Judge.
Edward R. Becker, M.D., Edward R. Becker, M.D., P.A., and Palm Beach Urology Associates, P.A., appeal from an order granting Plaintiffs Richard and Sue Williams' motion for new trial in a medical malpractice case. The new trial order nullifies the jury's verdict finding Dr. Becker not negligent for damaging a nerve in Mr. Williams' penis during a surgical procedure. By its order, the trial court deemed the defense verdict against the manifest weight of the evidence.
The issue on appeal is whether the trial court abused its discretion in granting a new trial. We conclude that it did. The pertinent facts follow.
While performing an operation upon fifty-seven year old Mr. Williams to remove a buildup of scar tissue in Mr. Williams' penis, Dr. Becker cut his patient's dorsal penile nerve. Mr. Williams and his wife sued Dr. Becker for his alleged negligence in performing the Horton-DeVine surgical procedure to excise the scar tissue, known as Peyronie's Plaque.
Mr. Williams initially sought treatment from Dr. Becker in June, 1989, after discovering an unusual lump on his penis and curvature of the penis upon erection. By February of 1990, the curvature was becoming more acute, and Dr. Becker recommended the Horton-DeVine procedure.
On May 2, 1990, Mr. Williams underwent the procedure. Dr. Becker, assisted by two other doctors, performed the main excision of the plaque. Dr. Becker, whose qualifications the parties hotly debated, had treated 150 to 200 patients with this condition, but had only performed this particular procedure three to four times. Dr. Becker's operative notes indicate that he isolated the plaque from surrounding structures, taking care not to injure the dorsal neurovascular bundles which run on both the right and left sides of the penis and contain the dorsal penile nerves. Dr. Becker observed that inflammation in the tissues made the various structures more adherent to each other. Consequently, he was unable to separate the tissue by blunt dissection, resulting in his use of sharp dissection. Dr. Becker testified that *1184 he did not see the precise dorsal penile nerves during this procedure because they were encased in the neurovascular sheath.
The surgery successfully corrected the curvature in Mr. Williams' penis  he could maintain an erection  but he noticed progressive loss of sensation. In July and October of 1990, Mr. Williams complained to Dr. Becker. Dr. Becker could not explain this condition; he thought the loss of sensation would have diffused by that time.
Mr. Williams subsequently consulted Dr. Wiita, who has treated over 1000 patients with Peyronie's Plaque, but had not performed the excision surgery. Dr. Wiita referred Mr. Williams to Dr. Horton, Sr., the Virginia plastic surgeon who jointly developed the Horton-DeVine surgical procedure in the early 1970's.
In October 1991, Mr. Williams underwent a second surgery to rectify the sensation loss. Dr. Horton, Sr., along with his son, Dr. Horton, Jr., a urologist, and Dr. Guy Trengove-Jones, a reconstructive microsurgeon, performed the surgery. They discovered the dorsal penile nerve had been severed. (Dr. Becker, in fact, agreed that he must have cut the nerve during the original surgery). The nerve had been cut on the left side of the penile shaft, although the scar tissue appeared on the right side. The second surgery was not successful in restoring sensation to Mr. Williams' penis.
At trial, the experts battled over whether Dr. Becker had performed the Horton-DeVine procedure in a negligent manner, thereby deviating from the professional standard of care.
The plaintiff offered the testimony of Dr. Wiita who, as noted earlier, does not perform excisions of Peyronie's plaque, which he considers to be delicate surgery requiring a high level of proficiency. Dr. Wiita found it below the standard of care for a surgeon to cut the dorsal penile nerve during any operation.
Plaintiffs next presented Dr. Horton, Sr. Based on Dr. Becker's operative report, Dr. Horton, Sr. concluded that the neurovascular bundle was not bound down by excessive scar tissue, and the inflammation was normal. Dr. Horton, Sr. concluded from the notes that the left nerve should not have been injured. Dr. Horton, Sr. stated that Dr. Becker fell below the standard of care when he cut the nerve.
Dr. Horton, Jr. testified for the defense that if the scarring from Peyronie's disease is severe, it can be difficult to differentiate between the neurovascular bundle and the scar tissue. Dr. Horton, Jr. testified that loss of function of the dorsal nerve (though not necessarily cutting of the nerve) is a known complication of the Horton-DeVine procedure. Dr. Horton, Jr. testified that even the most careful and experienced surgeon could cut a nerve. Dr. Horton, Jr. concluded that Dr. Becker had met the standard of care in performing the surgery.
A second defense expert, Dr. Walton, a qualified expert in urology who has performed approximately 50 Horton-DeVine procedures, also concluded that Dr. Becker did not deviate from the acceptable standard of care. He testified that loss of sensation is a known complication of the procedure, and that cutting the dorsal penile nerve is a known "possible" complication of the surgery.
At the conclusion of all the evidence, the trial court denied the Williams' motion for directed verdict on liability. The jury returned a defense verdict.
The trial court then entered the order granting a new trial, which provided in relevant part:
5. Some of this evidence indicated the surgery which the Defendant performed had been performed in this country since 1973, and that in over five hundred cases, there were no incidences reported where the dorsal nerve was cut during surgery.
6. The Defendant admitted it was a mistake to cut the dorsal nerve. The Defendant also admitted that the neurovascular bundle, which sits on top of the dorsal nerve, was bound down "like crazy glue" and it was negligence to proceed with the surgery while this condition persisted, without successfully removing the bundle, especially considering, in light of the Defendant's limited and remote experience.

*1185 7. The Defendant testified this was not an extremely difficult case. The Defendant's expert testified that cutting the nerve should only occur in extremely difficult cases.
8. The evidence was overwhelming that Defendant, while performing this operation, cut the posterior dorsal nerve in the penis. The evidence, although not totally unrebutted, given [sic] the Defendants the best view, conclusively shows and convinces this Court that the Defendant, Dr. Becker, fell below the standard of care of reasonable professionals in the medical community and that the jury's verdict misconstrued the legal affect [sic] of the evidence in finding the Defendant not negligent.
In reviewing an order granting a new trial based on the manifest weight of the evidence, this court should reverse only where the trial court abuses its discretion. Smith v. Brown, 525 So.2d 868, 870 (Fla. 1988); Cloud v. Fallis, 110 So.2d 669 (Fla. 1959) The trial court's discretion, however, is not unbridled. The trial judge should only intervene when the manifest weight of the evidence dictates such action. This court has previously held that the mere disagreement with a jury's verdict will not support a finding that the verdict is against the manifest weight of the evidence:
The weight to be given conflicting evidence, especially where the credibility of the witnesses is an issue, is a question for the jury and never one for the court. To allow the court to invade this province of the jury would violate the right to a jury trial. The only exception to this rule should be where the verdict is contrary to the manifest weight of the evidence. This by definition can exist only where the evidence is clear, obvious, and indisputable.

Perenic v. Castelli, 353 So.2d 1190, 1192 (Fla. 4th DCA 1977), cert. denied, 359 So.2d 1211 (Fla. 1978), quoted in Kashino v. Morell, 449 So.2d 958, 959 (Fla. 4th DCA 1984) (emphasis added).
The record supports a conclusion that the trial court abused its discretion in this case because the trial court's articulated reasons in support of its ruling do not demonstrate that the verdict was clearly, obviously and indisputably wrong. Instead, it is apparent from the order that the trial judge chose to believe plaintiffs' experts over defendants' experts, that he reweighed the evidence, and that the "facts" he found were not proven "indisputably."
The first ground the trial court articulated for granting a new trial was that the medical literature contained no previous reports of a surgeon cutting a dorsal penile nerve during the Horton-DeVine procedure. Although there was trial testimony to that effect, both Dr. Horton, Jr. and Dr. Walton explained why the lack of prior documentation was essentially irrelevant. Dr. Horton, Jr. pointed out that the only way to prove that a patient's nerve had been cut during a Horton-DeVine procedure would be to perform a second operation to assess the status of the penile nerves. Although patients other than Mr. Williams had been referred to Dr. Horton, Jr. with similar complaints of persistent numbness following surgery to remove Peyronie's plaque, Mr. Williams was the only one to undergo a second surgery. Similarly, Dr. Walton explained that the results of surgeries are rarely reported, and whether or not an incident is documented is fortuitous. The absence of documentation regarding prior incidents establishes neither that the present case is the very first instance in which such a nerve was cut during this procedure nor that the jury's verdict was against the manifest weight of the evidence.
The new trial order is also grounded on Dr. Becker's supposed "admission" that he made a mistake in cutting Mr. Williams' nerve. The record shows Dr. Becker made no such admission. Cf. Perry v. Langstaff, 383 So.2d 1104 (Fla. 5th DCA 1980) (affirming a summary judgment in favor of defendant urologist where evidence showed that the defendant did not admit any negligence in severing of an artery during a surgical procedure where that patient exhibited abnormal scar tissue formation, although the defendant did state that cutting of the artery should not occur under normal circumstances, but no evidence, expert or lay, was presented to support a breach of the requisite statutory duty under the extraordinary *1186 circumstances present there), rev. denied, 392 So.2d 1377 (Fla. 1980).
The third reason which the trial court assigns as a basis for finding the jury's verdict against the manifest weight of the evidence is that Dr. Becker "admitted that the neurovascular bundle, which sits on top of the dorsal nerve, was bound down `like crazy glue' and it was negligence to proceed with the surgery... ." Once again, a review of the record shows Dr. Becker made no such admission, and the trial court's contrary conclusion is based on a severe misinterpretation of the testimony. Dr. Becker used the term "crazy glue" as a shorthand way to convey the distinction between the anatomical condition of a penis afflicted with Peyronie's disease and a normal penis, which does not contain scar tissue. The trial court took Dr. Becker's choice of words to describe Mr. Williams' condition out of context, and improperly used this misinterpretation of the testimony to reweigh the expert testimony and Dr. Becker's credibility and qualifications.
The last specific reason which the new trial order gives as a basis for concluding that the verdict was against the manifest weight of the evidence is that Dr. Walton, one of the defense experts, testified that cutting the penile nerve should occur only in extremely difficult cases, and Dr. Becker said this was not such a case. This reason for granting a new trial is just as flawed as the others. It ignores Dr. Horton, Jr.'s opinion that Dr. Becker did not deviate from the standard of care, which opinion was not qualified by the degree of difficulty of this particular case.
The trial court also improperly failed to consider the totality of Dr. Walton's testimony. The testimony which the court seized upon in paragraph 7 of its order was a one-word affirmative response to a leading question on cross-examination by counsel for the Williamses. Apart from that, Dr. Walton repeatedly stated on direct examination that Dr. Becker did not deviate from the standard of care in this case, and he testified without qualification on redirect examination that nothing that came out during cross-examination had caused him to change his opinion. The jury obviously believed Dr. Horton, Jr. Consequently, the final reason set forth in the new trial order does not justify overturning the jury's verdict. See Allstate Ins. Co. v. Edenfield, 543 So.2d 874 (Fla. 4th DCA 1984) (reversing order granting new trial in case where jury found no permanent injury despite contention that expert testimony offered by party who won verdict was undermined on cross-examination: "We believe a fair reading of the expert's testimony would permit a jury to conclude that the appellee would not suffer permanent effects from her automobile accident."); see also Dunne v. Somoano, 550 So.2d 5, 7 (Fla. 3d DCA 1989) (defense verdict in medical malpractice case affirmed even though defendant gave different accounts of events in question on cross-examination and on direct, one of which constituted negligence and one of which did not: "The inconsistent statements of a person testifying once on the stand raise an issue of credibility to be resolved by the fact-finder... ."), rev. denied, 563 So.2d 631 (Fla. 1990).
The Williamses raise two issues on cross appeal. Neither would require the granting of a new trial.
Accordingly, we REVERSE and REMAND with instructions to reinstate the jury's verdict.
GUNTHER and STEVENSON, JJ., concur.